## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| Ralph Edwards, Inger Bautista, and Robert Burcina, as representatives of a class of similarly situated persons, and on behalf of the Nationwide Savings Plan,<br><br>     Plaintiffs,<br><br>v.<br><br>Nationwide Mutual Insurance Company, the Benefits Investment Committee of the Nationwide Savings Plan, and John Does 1-20,<br><br>     Defendants. | Case No.<br><br>   **COMPLAINT**<br><br>   **CLASS ACTION** |

## <u>NATURE OF THE ACTION</u>

1.      Plaintiffs Ralph Edwards, Inger Bautista, and Robert Burcina ("Plaintiffs"), as representatives of the Class described herein, bring this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"), against Nationwide Mutual Insurance Company ("Nationwide"), the Benefits Investment Committee of the Nationwide Savings Plan ("the Committee"), and John Does 1-20 (collectively, "Defendants"), related to the management of the Nationwide Savings Plan (the "401(k) Plan" or the "Plan"). As described herein, Defendants have breached their fiduciary duties with respect to their disloyal and imprudent management of the Plan in violation of ERISA, to the detriment of participant investors who lost millions of dollars. Plaintiffs bring this action to recover the losses caused by Defendants' fiduciary breaches, disgorge the profits earned by Defendants and their affiliates as a result of these breaches, prevent further mismanagement of the Plan, and obtain equitable and other relief as provided by ERISA.

## **PRELIMINARY STATEMENT**

2.      Americans have approximately $6.5 trillion invested in private sector defined contribution retirement plans, such as 401(k) and 403(b) plans. Defined contribution plans have largely replaced defined benefit plans—or pension plans—that were predominant in previous generations. Only around 8% of non-union U.S. workers in the private sector participate in a defined benefit plan. That figure will likely continue to decline.

3.      The potential for disloyalty and imprudence is much greater in defined contribution plans than in defined benefit plans. In a traditional defined benefit plan, each participant is entitled to a fixed monthly pension payment, while the employer is responsible for making sure the plan is sufficiently capitalized. In this scenario, the employer determines how to invest the plan's assets and bears all risk related to excessive fees and investment underperformance. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999). Thus, the employer has every incentive to avoid unnecessary expenses and remove imprudent investments.

4.      Defined contribution plans shift the costs and risks to plan participants. In a defined contribution plan, participants' retirement benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1826 (2015). The employer still controls the investments that will be offered, yet the employees bear all risk related to excessive fees and investment underperformance. The employees do not have the benefit of an employer obliged to fund any shortfall due to cost overruns or poor investment performance.

5.      For financial services employers like Nationwide, the potential for imprudent and disloyal conduct is especially high. Not only do the Plan's fiduciaries lack a direct incentive to prudently vet investment options and maximize returns, Defendants can benefit the company by utilizing the Plan's assets to further Nationwide's financial interests instead of the interests of the

Plan and its participants. These conflicts of interest are not present within a defined benefit plan, where the employer bears all risk of investment losses and pays all investment expenses.

6.    To protect workers from mismanagement of their hard-earned retirement assets, ERISA imposes strict duties of loyalty and prudence upon retirement plan fiduciaries. 29 U.S.C. § 1104(a)(1). "[T]he duties charged to an ERISA fiduciary are the highest known to the law." *Chao v. Hall Holding Co.*, 285 F.3d 415, 426 (6th Cir. 2002) (quotation omitted). Fiduciaries must act "solely in the interest of the participants and beneficiaries," and exercise "care, skill, prudence, and diligence" in carrying out their fiduciary functions. 29 U.S.C. § 1104(a)(1).

7.    Contrary to these fiduciary duties, Defendants failed to prudently manage the 401(k) Plan and used the Plan as an opportunity to promote their business interests at the expense of the Plan and its participants. Specifically, Defendants failed to negotiate contractual terms for the 401(k) Plan's Guaranteed Investment Fund ("GIF") comparable to the terms they negotiated on behalf of the Nationwide Retirement Plan ("the Pension Plan"), and as a result, the 401(k) Plan's GIF paid a much lower interest rate than was paid by the otherwise-identical investment held within the Pension Plan. This failure to negotiate at arm's length led to the Class losing over $142 million in benefits during the class period.[1]

8.    The GIF is a fixed-interest insurance contract that, like similar investments offered by many other insurance companies, guarantees the investor's principal and pays a fixed interest rate to investors over a specified period. The interest rate paid by these investments is ultimately set by the insurance company (here, Nationwide's wholly-owned subsidiary, Nationwide Life Insurance Company ("NLIC")) and periodically adjusted, typically quarterly. The interest rate is set either at the insurance company's discretion or pursuant to contractual terms negotiated with

---

[1] The class period encompasses the period on or after March 24, 2014, *see infra* at ¶ 51, pursuant to ERISA's six-year statute of limitations, *see* 29 U.S.C. § 1113(1).

the contract owner (which in the present case is the retirement plan itself) or a party acting on the owner's behalf (which in the present case is Defendants), or a combination of both, depending upon the contract's terms.

9.      In the context of Defendants' dealings with the 401(k) Plan, this process is tainted by an inherent conflict of interest. Funds invested in the GIF are deposited into Nationwide's General Account, which in turn invests in securities that generate a much higher rate of return than the guaranteed rate that Nationwide pays to GIF investors. Nationwide retains the difference between General Account earnings and the interest rate paid to GIF investors as profit, giving Nationwide a powerful financial incentive to pay GIF investors the lowest possible interest rate in order to maximize Nationwide's profit margin.

10.     These incentives align differently, however, in the context of the defined benefit Pension Plan. Participants in the Pension Plan are entitled to a specific benefit amount—rather than the earnings on Pension Plan investments—with Nationwide bearing the responsibility to make up any shortfall between Pension Plan investment returns and benefits payments. Thus, there is no financial incentive for Nationwide to "shortchange" the Pension Plan because it would be shortchanging itself, rather than participants (while simultaneously creating additional corporate tax liability). As a result, the fact that the Pension Plan's fixed-interest investment earns a much higher interest rate than the GIF—despite the fact that both accounts' assets are invested in the exact same pool of investments within Nationwide's General Account—demonstrates that Defendants succumbed to Nationwide's self-interest rather than prudently and loyally dealing with 401(k) Plan investments in the sole interests of Plan participants and beneficiaries.

11.     Significantly, Defendants' conduct in this regard does not align with that of other fiduciaries acting under similar circumstances. Fiduciaries of several other retirement plans sponsored by insurance companies that hold fixed-interest investments like the GIF in both their

4

401(k) and traditional pension plans—such as New York Life and Ameritas—were able to negotiate comparable contractual terms for both plans, resulting in interest rates for the 401(k) plan's fixed investment that were roughly the same as, if not better than, the rates paid to their pension plans. This contrast demonstrates that Defendants' failure to negotiate contractual terms comparable to those negotiated on behalf of the Pension Plan was not due to any differences between defined contribution and defined benefit plans, but instead to Defendants' failure to adhere to the high standards of prudence and loyalty required under ERISA.

12. Defendants consistently ignored the obvious deficiencies in the Plan's GIF investment throughout the class period. By managing the Plan in this fashion, Defendants have breached their fiduciary duties of prudence and loyalty, in violation of 29 U.S.C. § 1104.

## JURISDICTION AND VENUE

13. Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provides a private right of action to retirement plan participants to remedy breaches of fiduciary duties under ERISA, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. § 1109.

14. This case presents a federal question under ERISA, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1)(F).

15. Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the district where the Plan is administered, where the breaches of fiduciary duties giving rise to this action occurred, and where all Defendants may be found.

## THE PARTIES

### *Plaintiffs*

16. Plaintiff Ralph Edwards ("Edwards") resides in Springville, California. Edwards is a current participant in the 401(k) Plan. As of 2019, Edwards had approximately $242,000

invested in the Plan, including approximately $34,000 in the Plan's GIF. Edwards has been financially injured by Defendants' unlawful conduct and is entitled to receive benefits from the Plan in the amount of the difference between the value of his account and what his account would be worth had Defendants not violated ERISA as described herein.

17.     Plaintiff Inger Bautista ("Bautista") resides in Wake Forest, North Carolina. Bautista is a current participant in the 401(k) Plan. As of 2019, Bautista had approximately $47,000 invested in the Plan, including approximately $2,500 in the Plan's GIF. Bautista has been financially injured by Defendants' unlawful conduct and is entitled to receive benefits from the Plan in the amount of the difference between the value of his account and what his account would be worth had Defendants not violated ERISA as described herein.

18.     Plaintiff Robert Burcina ("Burcina") resides in Napa, California. Burcina is a current participant in the 401(k) Plan. Over the past six years, Burcina has had assets invested in the Plan's GIF. Burcina has been financially injured by Defendants' unlawful conduct and is entitled to receive benefits from the Plan in the amount of the difference between the value of his account and what his account would be worth had Defendants not violated ERISA as described herein.

### The Plan

19.     The Plan was originally established July 1, 1968 and is known as the Nationwide Savings Plan. The Plan is operated in Columbus, Ohio (Franklin County).

20.     The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34).

21.     The Plan is a qualified plan under 26 U.S.C. § 401 and is commonly referred to as a "401(k) plan."

22.     The Plan covers eligible employees of Nationwide and its various affiliates or

subsidiaries. Participants' accounts are funded through their own contributions. In addition, participants also received contributions from Nationwide.

23.     As of the end of 2014, the Plan had approximately $5 billion in assets, and approximately $5.7 billion as of the end of 2018. The Plan has had approximately 47,500 to 58,500 participants during the class period.

## Defendants

### Nationwide

24.     Nationwide Mutual Insurance Company is an insurance and financial services company headquartered in Columbus, Ohio.

25.     Nationwide is the "plan sponsor" within the meaning of 29 U.S.C. § 1002(16)(B) and has ultimate decision-making authority with respect to the management and administration of the Plan and its respective investments. Nationwide created the Committee and possesses the authority to appoint and remove members of the Committee, to whom it delegated certain fiduciary functions regarding the Plan's investments. Nationwide also retains ultimate financial responsibility for the acts or omissions of the Committee, as Nationwide indemnifies each member of the Committee for any loss or expense occurred by reason of any claims for asserted liability, absent bad faith, willful misconduct, or gross negligence.

26.     Because Nationwide exercises discretionary authority or discretionary control with respect to the Plan and its assets, it is a fiduciary under 29 U.S.C. § 1002(21)(A). In addition, it is well-accepted that the authority to appoint, retain, and remove plan fiduciaries constitutes discretionary authority or control over the management or administration of the plan, and thus confers fiduciary status under 29 U.S.C. § 1002(21)(A) and 29 U.S.C. § 1102(a)(1). *See* 29 C.F.R. § 2509.75-8 (D-4); *Detroit Terrazzo Contractors Ass'n v. Bd. Of Trustees of B.A.C. Local 32 Ins. Fund*, 71 F. App'x 539, 541 (6th Cir. 2003) (citing *Coyne & Delany Co. v. Selman*, 98 F.3d 1457,

1465 (4th Cir. 1996)) ("the power … to appoint, retain and remove plan fiduciaries constitutes 'discretionary authority' over the management or administration of a plan within the meaning of § 1002(21)(A)"). Further, the responsibility for appointing and removing members of the Committee carries with it an accompanying duty to monitor the appointed fiduciaries, to ensure that they are complying with the terms of the Plan and ERISA's statutory standards. *See* 29 C.F.R. § 2509.75-8 (FR-17). The Plan document recognizes this responsibility, as it requires the Committee to prepare an annual report for the Board of Directors of Nationwide regarding the Plan.

### *The Benefits Investment Committee of the Nationwide Savings Plan*

27.     The Committee is named as a fiduciary in the Plan Document, with responsibility for oversight of the Plan's investments, including selecting and monitoring the Plan's investment funds. These responsibilities include negotiating the terms of the Plan's GIF. Thus, the Committee and its members are named fiduciaries under 29 U.S.C. § 1102(a) because they are identified in the Plan Document as having responsibility for the Plan's investments. The Committee and its members are also functional fiduciaries of the Plan under 29 U.S.C. § 1002(21)(a) because they exercised discretionary authority and discretionary control regarding the management and disposition of the Plan's assets.

### *John Does 1-20*

28.     The names of the members of the Committee during the class period are currently unknown to Plaintiffs. Parties to whom Nationwide's or the Committee's fiduciary authority was delegated are similarly unknown to Plaintiffs. Those Defendants are therefore collectively named as John Does 1–20.

## **ERISA FIDUCIARY DUTIES**

29.     ERISA imposes strict fiduciary duties of loyalty and prudence upon fiduciaries of

8

retirement plans. 29 U.S.C. § 1104(a)(1) states, in relevant part:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
>> (A)    for the exclusive purpose of
>>
>>> i.    providing benefits to participants and their beneficiaries; and
>>>
>>> …
>>
>> (B)    with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims . . . .

30.    These ERISA fiduciary duties are "the highest known to the law." *Hall Holding Co.,* 285 F.3d 415, 426 (6th Cir. 2002) (quoting *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996)).

## DUTY OF LOYALTY

31.    The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that he must display . . . complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Id.* at 224 (quotation marks and citations omitted).

32.    While ERISA does not prohibit an employer's corporate officers or high-level employees from serving as plan fiduciaries—basically wearing two hats—it does require that they "wear the fiduciary hat when making fiduciary decisions." *Pegram*, 530 U.S. at 225.

33.    "[A]n ERISA fiduciary must 'act for the exclusive purpose' of providing benefits to plan beneficiaries." *Gregg v. Transportation Workers of Am. Int'l*, 343 F.3d 833, 841 (6th Cir. 2003)  (quoting *Donovan v. Bierwirth,* 680 F.2d 263, 271 (2d Cir.1982)).   Thus,  "in  deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider

9

*only* factors relating to the interests of plan participants and beneficiaries. A decision to make an investment may not be influenced by non-economic factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." U.S. Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

## DUTY OF PRUDENCE

34.    ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015). If an investment is imprudent, the plan fiduciary "must dispose of it within a reasonable time." *Id.* (quotation omitted).

35.    The fact that participants exercise "independent control" over the assets in their defined contribution plan accounts "does not serve to relieve a fiduciary from its duty to prudently select and monitor any…designated investment alternative offered under the plan." 29 C.F.R. § 2550.404c-1(d)(1)(iv). Indeed, the Sixth Circuit has held:

> A fiduciary cannot avoid liability for offering imprudent investments merely by including them alongside a larger menu of prudent investment options. Much as one bad apple spoils the bunch, the fiduciary's designation of a single imprudent investment offered as part of an otherwise prudent menu of investment choices amounts to a breach of fiduciary duty, both the duty to act as a prudent person would in a similar situation with single-minded devotion to the plan participants and beneficiaries, as well as the duty to act for the exclusive purpose of providing benefits to plan participants and beneficiaries.

*Pfeil v. State St. Bank & Tr. Co.*, 671 F.3d 585, 597 (6th Cir. 2012), *abrogated on other grounds by Dudenhoeffer*, 134 S. Ct. 2459.

10

## CO-FIDUCIARY LIABILITY

36.     ERISA also imposes explicit co-fiduciary duties on plan fiduciaries. 29 U.S.C. §

1105(a) states, in pertinent part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)     If he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
> (2)     if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)     If he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

## **BACKGROUND**

### *The Pension Plan*

37.     In addition to the 401(k) Plan, Nationwide also offers the Pension Plan, a

traditional defined-benefit retirement plan. Unlike the 401(k) Plan, where participants' account

value is determined by the performance of their investments, in the Pension Plan Nationwide is

obligated to pay fixed benefit amounts to its participants, and Nationwide bears all expenses if

plan investment returns fall short of these monthly obligations.

38.     Like the 401(k) Plan, the Pension Plan invests in a guaranteed investment fund

("the Pension Plan's GIF") offered by Nationwide. The underlying assets in the both the Pension

Plan's GIF and the GIF in the 401(k) Plan are deposited in Nationwide's General Account. Thus,

both investments are backed by the exact same underlying securities. Differences in returns

between the two investments therefore cannot be attributed to any difference in the risk profile

11

of the underlying portfolio. Additionally, because the Committee is the named investment fiduciary of the Pension Plan as well as the Plan, the Committee was responsible for negotiating and overseeing the terms of the Pension Plan's GIF, just as it was for the 401(k) Plan's GIF. But despite the fact that the Pension Plan's GIF is materially identical to the Plan's GIF, the Pension Plan's GIF consistently paid a higher interest rate than was paid by the Plan's GIF.

### *Defendants' Conflict of Interest*

39.      As noted above, funds invested in the GIF are deposited in the company's General Account, where they are commingled with money collected from insurance policy premiums and other business operations. Every insurance company maintains such a general account. Assets held in the General Account are invested in a portfolio of underlying investments including fixed income securities, mortgages, and similar instruments, most of which typically make monthly interest payments to Nationwide. When the General Account investment earnings generated by the GIF assets exceed the interest payments to GIF investors, a profit is generated for Nationwide. And while the GIF is technically administered by NLIC, Nationwide's wholly owned subsidiary, the profits generated by the GIF are retained by Nationwide, not NLIC, as all profits from General Account investment activities accrue to Nationwide, according to the company's financial statements. Given the relationship between the interest rate paid by the GIF and the profits generated by the General Account, Nationwide's profits go up if the GIF's interest rate goes down.

40.      This self-dealing arrangement creates a powerful conflict of interest given the roughly $1.7 billion in funds invested in the 401(k) Plan's GIF, and it raises a strong inference that Defendants' negotiation and subsequent tolerance of a lower crediting rate for the 401(k) Plan's GIF, relative to the Pension Plan's GIF, was influenced by the incentive to engage in self-dealing at the expense of employees' retirement savings.

12

## **DEFENDANTS' VIOLATIONS OF ERISA**

41.     Throughout the class period, the 401(k) Plan has had roughly $1.7 billion invested in the GIF, representing roughly 30% or more of total Plan assets each year, by far the single largest holding in the Plan year after year. During this time, the average annual interest rate paid by the GIF has been between 3.08 and 3.59 percentage points. At the same time, the Pension Plan's GIF paid a significantly higher interest rate, consistently paying the Pension Plan a rate between 1.21 and 1.5 percentage points greater than the rate paid to the 401(k) Plan, a more than 30% greater rate of return. The Pension Plan's GIF received this higher interest rate despite the fact that it held less than $200 million in assets, and thus had *less* negotiating power than the 401(k) Plan. The difference between the rates paid to the 401(k) Plan's GIF and the Pension Plan's GIF represents more than $140 million in losses to the Plan, as set forth in detail in the following table:

| Year[2] | 401(k) GIF Assets | 401(k) Rate | Pension Rate | Difference | Losses |
|---|---|---|---|---|---|
| 2019 | $ 1,709,951,897.00 | 3.09% | 4.46% | 1.37% | $ 23,426,340.99 |
| 2018 | $ 1,709,951,897.00 | 3.09% | 4.46% | 1.37% | $ 23,426,340.99 |
| 2017 | $ 1,739,893,230.00 | 3.08% | 4.48% | 1.40% | $ 24,358,505.22 |
| 2016 | $ 1,795,948,542.00 | 3.30% | 4.80% | 1.50% | $ 26,939,228.13 |
| 2015 | $ 1,703,734,992.00 | 3.35% | 4.80% | 1.45% | $ 24,704,157.38 |
| 2014 | $ 1,663,772,148.00 | 3.59% | 4.80% | 1.21% | $ 20,131,642.99 |
| | | | | **Total Loss[3]** | **$ 142,986,215.70** |

42.     Given that the 401(k) Plan's GIF and the Pension Plan's GIF were backed by identical investments, and were negotiated by the same parties, the significant difference in rates paid to the 401(k) Plan and the Pension Plan supports a reasonable inference that Defendants failed to negotiate competitive terms at arm's length for the 401(k) Plan's GIF or implement a prudent process for ensuring that the best rate available from Nationwide was pursued for the benefit of Plan participants.

---

[2] 2019 data is not yet publicly available; 2018 data is used as a placeholder estimate for 2019 figures.
[3] "Total" is the sum of raw annual losses, and has not been adjusted to reflect the present value of these losses.

43.     The fact that this failure provided a direct and significant financial benefit to Nationwide of more than $20 million dollars each year also demonstrates that Defendants failed to act with an "eye single" to the interests of Plan participants. As explained above, Nationwide retains the difference between the interest paid on GIF investments and the returns on its General Account. The greater the spread between these rates, the more money Nationwide is able to retain for itself. By failing to obtain the best available rate for the 401(k) Plan's GIF investment, Defendants allowed Nationwide to profit at the direct expense of the Plan and its participants.

44.     The interest rate for the 401(k) Plan's GIF investment is reset on a quarterly basis, giving Defendants numerous opportunities to remedy their failings. Instead, Defendants continued to turn a blind eye to the deficiencies of the 401(k) Plan's GIF investment, which were especially obvious when compared to the higher rate Defendants obtained for the Pension Plan's GIF.

45.     It is rare to find insurance companies that include a proprietary fixed-rate investment in both their defined contribution and defined benefit plans, as Nationwide did. But unlike Defendants, the fiduciaries of several insurance company plans that do so were able to negotiate approximately comparable, if not more favorable, terms for the fixed-rate investment in their 401(k) plans relative to a similar investment in their pension plans. For example, in the case of New York Life Insurance Company, plan fiduciaries were able to negotiate terms such that the crediting rate for the 401(k) fixed-rate investment was roughly comparable to, if not higher than, a similar investment within the pension plan in every single year for which information is available,[4] as shown in the following table:

---

[4] New York Life removed the crediting rate from the Form 5500s for their 401(k) plan beginning in 2016. Based upon Plaintiffs' review of the amount of interest paid by the GIF, as shown by those forms, it appears that the fixed account in New York Life's 401(k) plan has continued to pay comparable or better interest rates than the identical fixed-rate investment held in the company's pension plan.

| New York Life Insurance Company | | |
|---|---|---|
| Year | 401(k) Plan Fixed Account Rate | Pension Plan Fixed Account Rate |
| 2015 | 5.05% | 4.82% |
| 2014 | 5.20% | 5.08% |
| 2013 | 5.35% | 5.17% |
| 2012 | 5.45% | 5.51% |
| 2011 | 5.60% | 5.93% |
| 2010 | 6.00% | 5.95% |
| 2009 | 6.10% | 5.94% |

46. As another example, fiduciaries of the Ameritas Life Insurance Corporation's 401(k) Plan consistently negotiated terms for the 401(k) plan's fixed-rate investment that resulted in interest rates that were the same or better than those paid by the identical fixed-rate investment held by Ameritas's pension plan, as detailed below:

| Ameritas Life Insurance Corporation[5] | | |
|---|---|---|
| Year | 401(k) Plan Fixed Investment Interest Rate | Pension Plan Fixed Investment Interest Rate |
| 2018 | 3.0% - 3.8% | 3.0% - 3.8% |
| 2017 | 3.0% - 3.9% | 2.8% - 3.8% |
| 2016 | 3.0% - 3.9% | 2.5% - 3.9% |
| 2015 | 3.0% - 4.0% | 2.6% - 4.0% |
| 2014 | 2.9% - 4.1% | 2.9% - 4.1% |
| 2013 | 2.3% - 4.3% | 2.3% - 4.3% |
| 2012 | 2.4% - 4.4% | 2.4% - 4.4% |
| 2011 | 3.1% - 4.7% | 3.1% - 4.7% |
| 2010 | 3.5% - 5.1% | 3.5% - 5.1% |
| 2009 | 4.3% - 6.0% | 4.3% - 6.0% |

47. These examples underscore Defendants' ability to negotiate comparable, if not superior, terms for the 401(k) Plan's GIF investment relative to the terms Defendants negotiated

---

[5] Ameritas does not report the average interest rate paid in a given year, but instead displays the range of crediting rates paid during the calendar year. The ranges of interest rates for the 401(k) plan's fixed-rate investment are consistently equal to or better than the ranges for the pension plan's fixed-rate investment, demonstrating that the fixed-rate investment within the 401(k) plan has comparable or superior terms than the fixed-rate investment in the pension plan.

for the Pension Plan's GIF investment, had they acted prudently and loyally, untainted by self-interest. By failing to manage the Plan in this fashion, Defendants have breached their fiduciary duties of prudence and loyalty, in violation of 29 U.S.C. § 1104.

### PLAINTIFFS LACKED KNOWLEDGE OF DEFENDANTS' CONDUCT, INVESTMENT PROCESS, AND OTHER MATERIAL FACTS

48.    Plaintiffs did not have actual knowledge of all the material facts necessary to understand that Defendants breached their fiduciary duties as described herein until shortly before this suit was filed.[6] This includes, among other things, knowledge regarding the difference between the interest rate of the Plan's GIF and Pension Plan's GIF, the ability of the Plan's fiduciaries to negotiate superior terms for the GIF, the success of similar plans' fiduciaries in negotiating approximately equal crediting rates for both types of plans' fixed-rate investments, the amount of losses suffered by Plan participants as a result of having a lower rate relative to the Pension Plan's GIF, the details of the contractual arrangement underlying the Plan's GIF, the nature of the Plan's funds being pooled with Nationwide's general account, and the nature of Defendant's conflict of interest in profiting from a lower crediting rate.

49.    Further, Plaintiffs do not have actual knowledge of the specifics of Defendants' decision-making or negotiation processes with respect to the Plan or the Plan's investments because this information is solely within the possession of Defendants prior to discovery. For purposes of this Complaint, Plaintiffs, through their counsel, have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth herein.

### CLASS ACTION ALLEGATIONS

---

[6] Plaintiff's counsel began an investigation of the Plan in late 2019. Plaintiff did not review any of the documents cited in this Complaint or any of the information contained therein—including all studies, investment data, and Form 5500s cited herein—until after this investigation had begun.

50.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action on behalf of the Plan to obtain for the Plan the remedies provided by 29 U.S.C. § 1109(a). Plaintiffs seek certification of this action as a class action pursuant to this statutory provision and Fed. R. Civ. P. 23.

51.    Plaintiffs Ralph Edwards, Inger Bautista, and Robert Burcina assert their claims in Counts I and II on behalf of a class of participants and beneficiaries of the Plan defined as follows:[7]

> All participants and beneficiaries of the Nationwide Savings Plan who held assets in the Plan's Guaranteed Investment Fund at any time on or after March 24, 2014, excluding Defendants, employees with responsibility for the Plan's investment or administrative functions, and members of Nationwide's Board of Directors.

52.    <u>Numerosity</u>:   The Class is so numerous that joinder of all Class members is impracticable. The Plan has had approximately 47,500 to 58,500 participants during the applicable period, with the GIF making up 30% or more of total assets in the Plan. Accordingly, it is reasonable to infer that the number of Plan participants invested in the GIF numbers in the thousands or tens of thousands.

53.    <u>Typicality</u>:   Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs are participants in the Plan who have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members with regard to the Plan. Defendants managed the Plan as a single entity, and therefore Defendants' imprudent decisions affected all Plan participants similarly.

54.    <u>Adequacy</u>:   Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with the Class that they seek to represent, and they have retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiffs do

---

[7] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

55.    <u>Commonality</u>:  Common questions of law and fact exist as to all Class members, and predominate over any questions solely affecting individual Class members, including but not limited to:

      a.    Whether Defendants are fiduciaries of the Plan;

      b.    Whether Defendants breached their fiduciary duties by engaging in the conduct described herein;

      c.    The proper form of equitable and injunctive relief;

      d.    The proper measure of monetary relief.

56.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

57.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court, such as changes to Plan investments, renegotiation of the rate offered to Plan participants for the GIF, removal of a Plan fiduciary, or appointment of an independent fiduciary, would be dispositive of non-party participants' interests. The accounting and restoration of the property of the Plan that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

58.     Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will eliminate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

### COUNT I
**Breach of Duties of Loyalty and
Prudence 29 U.S.C. § 1104(a)(1)(A)–(B)**

59.     Defendants are fiduciaries of the Plan.

60.     29 U.S.C. § 1104 imposes fiduciary duties of prudence and loyalty upon Defendants in their administration of the Plan and in their selection and monitoring of Plan investments.

61.     The scope of the fiduciary duties and responsibilities of Defendants includes managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence required by ERISA. Defendants are directly responsible for selecting prudent investment options, evaluating and monitoring the Plan's investments on an ongoing basis, and eliminating imprudent ones. This

duty includes "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble*, 135 S. Ct. at 1829.

62.     As described throughout this Complaint, Defendants failed to employ a prudent and loyal process for negotiating a crediting rate for the 401(k) Plan's GIF comparable to the Pension Plan's GIF. In doing so, Defendants failed to make Plan investment decisions based solely on the merits and what was in the interest of participants, and instead made investment decisions that would benefit Nationwide. Defendants therefore failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries of the Plan, and for the exclusive purpose of providing benefits to participants and their beneficiaries, in violation of their fiduciary duty of loyalty under 29 U.S.C. § 1104(a)(1)(A).

63.     In so doing, Defendants also failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, thereby breaching their duties under 29 U.S.C. § 1104(a)(1)(B).

64.     Each Defendant is personally liable, and Defendants are jointly and severally liable, under 29 U.S.C. §§ 1109(a), 1132(a)(2), and (a)(3), to make good to the Plan the losses resulting from the aforementioned breaches, to restore to the Plan any profits Nationwide made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count.

65.     Each Defendant knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge their own duties, and knew of the breaches by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breaches.

Accordingly, each Defendant is also liable for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**COUNT II**
**Prohibited Transactions**
**29 U.S.C. § 1106**

66.     As described throughout this Complaint, Defendant Nationwide is a fiduciary with respect to the Plan, and Nationwide and NLIC are both a "party in interest" under ERISA, 29 U.S.C. § 1002(14).

67.     As described throughout the Complaint, Nationwide and NLIC earned a profit in each month in which the investments in the general account earned a higher rate of return than the interest rate paid by the GIF. Similarly, Nationwide and NLIC enjoyed a financial benefit each quarter that the GIF's interest rate was set by NLIC at a lower level than Nationwide expected to earn on the investments in its General Account.

68.     By receiving this investment income and retaining these profits, Nationwide dealt with the assets of the plan in its own interest and for its own account in violation of 1106(b)(1), and also received consideration for its personal account from a party dealing with the plan in connection with a transaction involving the assets of the Plan in violation of 1106(b)(3).

69.     In addition, these transactions constituted a direct or indirect furnishing of services between the Plan and a party in interest, and a direct or indirect transfer of assets of the Plan to a party in interest, in violation of 29 U.S.C. § 1106(a)(1)(C) and (D).

70.     As a direct and proximate result of these prohibited transactions, Nationwide received profits that it was prohibited from receiving under ERISA, and Plan participants lost earnings that they would have received had the transactions in question not generated consideration for Nationwide's personal account. Nationwide is liable to make good to participants all losses suffered as a result of its prohibited transactions, and to disgorge all profits

associated with its unlawful conduct. In addition, participants are entitled to further equitable and injunctive relief on account of these prohibited transactions.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Bautista, Edwards, and Burcina, as representatives of the Class defined herein, and on behalf of the Nationwide Savings Plan, pray for relief as follows:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.    A declaration that Defendants have breached their fiduciary duties under ERISA;

D.    An order compelling Defendants to personally make good to the Plan all losses that the Plan incurred as a result of the breaches of fiduciary duties described above, and to restore the Plan to the position it would have been in but for this unlawful conduct;

E.    An order requiring Nationwide to disgorge all revenues received from, or retained as a result of, the fiduciary breaches described herein;

F.    An order granting equitable restitution and other appropriate equitable monetary relief against Defendants;

G.    An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.    Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan; appointment of an independent fiduciary to renegotiate the rate offered to Plan participants for the Guaranteed Investment Fund; and removal of Plan fiduciaries deemed to have breached their fiduciary duties and/or engaged in prohibited transactions.

I.    An award of pre-judgment interest;

J.    An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine;

K.    An award of such other and further relief as the Court deems equitable and just.

Dated: March 24, 2020

**BARKAN MEIZLISH DEROSE WENTZ MCINERNEY PEIFER, LLP**

By: /s/ Robert DeRose
Robert E. DeRose   (OH #0055214)
Sanford A. Meizlish (OH #0002620)
250 E. Broad Street, 10 Floor
Columbus, OH 43215
Telephone: (614) 221-4221
Facsimile: (614) 744-2300
bderose@barkanmeislish.com
smeizlish@barkanmeizlish.com

**NICHOLS KASTER, PLLP**
Paul J. Lukas, MN Bar No. 22084X *
Kai H. Richter, MN Bar No. 0296545*
Brock J. Specht, MN Bar No. 0388343*
Christopher Theophillus Smith, MN Bar No. 0401091*
    * *pro hac vice* application forthcoming
4600 IDS Center 80 S 8th Street
Minneapolis, MN 55402
Telephone: 612-256-3200
Fax: 612-338-4878
lukas@nka.com
krichter@nka.com
bspecht@nka.com
tsmith@nka.com

Counsel for Plaintiffs and the proposed Class